| | |
|---|---|
| Eva Werner vs. R. I. Hospital Trust Company, Trustee | P. A. No. 1325. |
| Hattie G. Wolfe vs. R. I. Hospital Trust Company, Trustee | P. A. No. 1326. |

December 28, 1933.

CAPOTOSTO, J. Appeals from the probate of the will of Berman Greenblatt, who died at the age of 68 in Providence on February 21, 1932. The will is dated October 10, 1928. The trial, which lasted for over five weeks, was keenly contested by distinguished attorneys on both sides. The jury was an exceptional one, both as to patience and intelligence. The Court tried to imitate the jury in these respects. The sole question in issue was whether or not the testator on October 10, 1928, possessed testamentary capacity to execute a will. The jury found against the will. The proponent asks for a new trial on the usual grounds.

These cases have been the subject of serious reflection and concern to the Court. Personal notes as well as the brief and partial transcript of the testimony submitted by the proponent in arguing its motion for a new trial have been carefully reviewed. The Court takes this opportunity to thank

counsel on both sides for their fairness, courtesy and assistance. It also wishes to express its high personal esteem for each physician who testified at the trial. Whatever observations it may hereafter consider its duty to make, let him rest assured that it is directed to a medico-legal practice rather than a criticism of the ability or integrity of any individual.

The contestants, Eva Werner and Hattie G. Wolfe, were daughters of the deceased. Both had received substantial educations, the first as a teacher and the second as a doctor in medicine. Each married with parental consent before the death of the mother on January 18, 1923. Except for incidents of minor importance, the relations between father and daughters were cordial at least up to the time that he went to the Peter Bent Brigham Hospital in Boston in May, 1926, suffering with pernicious aenemia and arteriosclerosis. At that time the testator was in his 62nd year. He returned to Providence within a month and except for absences of varied duration lived here until his death.

The daughter, Eva, had no children. Hattie, on the other hand, had two children when he went to the hospital and three by the time he executed the instrument in question. There is no doubt that the testator was extremely fond of his grandchildren, especially the older two.

The testator's mental condition, in so far as it bears upon the issue in these cases, is reflected in his speech and conduct from the death of his wife in 1923 to the time of his own death in 1932. This period of approximately nine years shows various degrees of mental disturbance. For convenience it may be divided into three parts: first, from 1923 to the time in 1926 that he went to the hospital in Boston; second, from his return from that institution to October 10, 1928, the day when the alleged will was executed, and third, from that day to the time of his death in Butler Hospital in February, 1932.

In the first period, that is between 1923 and 1926, he began to show signs of delusions, but they were more or less of a morbid character and referred most often to the possible appearance of his dead wife. His general attitude was one of apprehension of both the living and the dead without fixing upon any definite person or thing.

During the period from 1926 to October 10, 1928, the delusions took definite form, became centered around definite individuals, and gradually enlarged the field of the participants either as principals or agents. Ideas of grandeur struggled with an increasing fear of spies and poison. There is no doubt that the testator believed himself surrounded by the emissaries of his destruction. He began to suspect every one with whom he came in contact, and manifested this dread by taking precautions too numerous to detail and inexplicable except as the product of an unbalanced mind. The arch fiends in this conspiracy to do away with him in order to get his money were his two sons-in-law and his two daughters. He began by first accusing Werner, then added Wolfe, and finally ended by including his daughters, Eva and Hattie. He shunned them whenever he could, but avoided any direct accusation. His mind began to scheme to defeat both their agents and their ultimate aim. His conduct became erratic, secretive, and indulgent to persons and things which normally he would avoid, if not condemn, until fear drove him elsewhere.

In the early part of September, 1928, he consulted an attorney with reference to making a will. Following a number of conferences and while the final draft was being considered, the testator inquired upon what grounds

a will could be upset. After eliminating the grounds of execution and undue influence, the discussion turned to the matter of testamentary capacity. As a result, the testator evinced a desire to be examined by an alienist and secure a certificate from him attesting to his mental soundness, which he wished to file with his will. On September 20, 1928, he was, in fact, examined by a recognized psychologist. A day or so later the testator received a certificate certifying that he was of sound mind. On September 25, 1928, he executed the first will. The lawyer was not told and the doctor in his own examination of some two hours was not informed by his patient, nor did he discover, the abberations of the testator's mind.

Having executed the will of September 25, 1928, the testator, both alone and in company with his attorney, then interviewed an officer of the Rhode Island Hospital Trust Company, which was named as trustee in the instrument. Certain changes of a minor nature were suggested and accepted by the testator with reference to investments. The present will was prepared and finally signed on October 10, 1928. To these two persons no intimation of any false notions was manifested by the testator, other than a reticence to amplify to his lawyer the statement that his daughters were "not treating him right."

To persons who were not assisting him in the preparation of a will, however, the statements and conduct of the testator were quite different. He expressed his fear of spies and poison quite freely, and in a number of instances referred directly to the fact that he was going to best, or actually had bested, those who were responsible for a system which tormented him at every turn. He evinced satisfaction at the fact that he had put his property beyond the reach of his daughters and sons-in-law by a will which they could not invalidate because he had a physician's certificate saying that he was of sound mind.

The provisions of both the will of September 25 and of October 10, 1928, are practically the same, except as to the accumulation of income and details of investment. After making a number of minor bequests to Jewish charities, and leaving a small sum annually to each of his two daughters, the testator leaves the residue of his estate in trust: "said trust with its accumulations shall continue, in any event, during the lifetime of my daughters and at their death shall be paid in equal portions to my grandchildren * * * provided such grandchildren, or the survivor or survivors thereof shall all have reached the age of twenty-one years, but if on the death of my daughters, any grandchild of mine has not attained its twenty-first birthday, then said trust shall further continue until all my surviving grandchildren have reached the age of twenty-one years * * *".

The period from October 10, 1928, to the time of Greenblatt's death on February 21, 1932, is one of progressive wretchedness. His field of delusions became wider and wider so that almost every one was a spy or potential poisoner. During this period, he took various trips presumably for pleasure and rest, but in reality they were the wanderings of a restless personality seeking to outwit his imaginary persecutors. No one knew when or where he went. His return remained subject to his own impulse. In 1929 Greenblatt roamed from coast to coast and to Cuba. For nearly a year he dodged from place to place, yet he found his enemies everywhere. In his misery, however, he probably derived some comfort from the idea of grandeur which also affected his mind. On his return from his long trip, Greenblatt evidenced pleasure in relating how he had flown with Colonel

Lindbergh and how gracious President Coolidge had been to ask him to dance with Mrs. Coolidge. His condition was pitiable. At this time, his daughter, Dr. Wolfe, intervened. A guardian was appointed, and on October 3, 1930, the testator was admitted to the Butler Hospital, where he remained until his death.

From the testator's life and the provisions of the will, the parties draw opposite conclusions. The proponent maintains that if there were any false ideas or delusions they were variable and not permanent; that they were dormant and inoperative at the time of the making of the will; and that his general attitude as reflected in his conduct and speech as well as in his testamentary disposition shows a firm determination to dispose of his property so that his grandchildren might be reasonably protected in mature life or old age. The contestants, on the other hand, claim that the will is violent and unnatural; that his conduct towards his daughters and sons-in-law from the time of his wife's death was without justification, in direct contrast to his previous behaviour and the product of a diseased mind; and that the residuary clause by itself alone clearly shows that a mind which began to be affected in 1923, that showed clear proof of unbalance in 1926, was saturated with delusionary ideas about his daughters on October 10, 1928.

With these divergent contentions as the basic issue, the parties first marshalled their facts and then resorted to the testimony of mental experts. Men of reputation in the field of psychiatry were called by both sides and immediately proceeded to unequivocally contradict each other. In qualifications and experience there was no choice. Each started with his own conception of the human mind, selected his own premise, listened to assumed facts as presented to him by the side that had retained him as a witness, and finally expressed a favorable conclusion which remained unchanged in spite of anything and everything that the opposite party might suggest. For weeks this medical disputation of conflicting theories, of nebulous inferences, and of carefully guarded phraseology went on ostensibly for the enlightenment of the Court and jury. Both unfortunate victims bore the ordeal with patience but, in so far as the Court is concerned, without profit. Testifying under a procedure which inferentially obligates medical witnesses to the contending parties rather than to the Court, and considering further the latitude for speculation made possible by the mysteries of the human mind, it is not strange that the average man at first is perplexed and ends by concluding that the testimony of alienists in legal matters is a commodity which may be purchased at prevailing prices.

Reputable doctors in professional consultation over the condition of a private patient seldom disagree in their conclusions. Why such a clash of opinion when arrayed on opposite sides in Court? The answer is problematic, yet a possible explanation may be found in the fact that in legal controversies an issue rather than the physical welfare of an individual is apparently involved. As a matter of fact, there is an invisible patient in every Court case in which medical experts are used. It is the cause of human justice, the protector of established rights and of our common welfare. If medical experts were freed from every obligation to litigants and made responsible to the Court alone, one could reasonably expect from them that same effort to agree which they so commendably employ in the treatment of a private patient. The Courts and the medical profession would thereby gain in public esteem.

In this particular case, Berman Greenblatt's estate became the prize of a lengthy medical debate, which

translated his entire life into assumptions and hypotheses. The opinions expressed in favor of both sides were as impregnable as the proverbial Rock of Gibraltar. A mathematical formula could give no more positive result. A stalemate was created for the lay mind. No person without substantial training in psychiatry could separate with any degree of safety fact from inference, or theory from accepted medical knowledge. Perhaps the doctors even had a smile at our predicament. Under such circumstances, this Court could find no fault if the jury rejected all expert testimony and proceeded to decide the case upon ordinary common sense. It may be that it did. But whether it did so or not, the jury returned a verdict which is reasonably consistent with and supported by the evidence as interpreted. Even though an opposite conclusion might have been possible, the Court finds no reason in law to disturb a verdict based upon a reasonable view of the testimony.

Motion for new trial denied.

For appellants: James G. Connelly, Hinckley, Allen, Tillinghast, Phillips & Wheeler.

For appellees: Tillinghast & Collins, Philip V. Marcus.